UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANTHONY C. MARTIN,

      Petitioner,

        v.                        CAUSE NO. 3:23-CV-258-SJF

WARDEN,

      Respondent.

## OPINION AND ORDER

Anthony C. Martin, a prisoner without a lawyer, filed a habeas corpus petition

under 28 U.S.C. § 2254 to challenge his conviction for murder under Case No. 02D05-

1307-FB-131. Following a jury trial, on June 24, 2014, the Allen Superior Court sentenced

him as a habitual offender to fifty years of incarceration.

In deciding this habeas petition, the court must presume the facts set forth by the

state courts are correct unless they are rebutted with clear and convincing evidence. 28

U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence

presented at trial:

> Around 12:45 a.m. on July 23, 2013, Tyler Zoda, Devon Stewart, and Cory
> Clemmer were sitting in the back of their truck eating pizza in the parking
> lot of Papa John's Pizza near State Street and Maplecrest Road in Fort
> Wayne, Indiana. Zoda walked over to the Shell gas station and
> convenience store ("Shell station") at 6321 East State Street, which was
> located next door to the parking lot, to buy something to drink. After
> Zoda left, Stewart and Clemmer saw what they believed to be a red Ford
> Explorer driving quickly past. The vehicle was loud, and Stewart and
> Clemmer observed it drive past them several times and circle the Shell
> station. On their last observation of the Explorer, Stewart and Clemmer
> saw it near the car wash located behind the Shell station, driving rapidly

away. As they watched, the Explorer hit a bump, causing the car wash door to open, and drove away from the area of Maplecrest Road.

At approximately the same time that night, a man, later identified as Frederick Freeman, entered the Shell station, wearing a dark hat, a white covering over his lower face, a dark shirt, and gloves, and pointed a silver handgun at the clerk, Dalvir Singh. Freeman told Singh to give him the money, and Singh opened the cash register, pulled out the money tray, containing approximately $300, and placed it on the counter. Freeman took the money tray, exited the Shell station, turned left, and ran toward Maplecrest Road.

While the robbery was occurring, Justin Douglas and some friends drove up to a gas pump outside the Shell station, and Douglas exited the car. As he approached the Shell station, he observed the robbery in progress. Freeman pointed the handgun at Douglas and told him to leave. Douglas went back to the car and told the driver to leave. As they drove away, Douglas called the police, reported the robbery, and gave a description of Freeman and the direction he traveled. Zoda, who was inside the shell station at the time of the robbery, also called 911 immediately after Freeman left.

At approximately 12:50 a.m., officers from the Fort Wayne Police Department heard the dispatch regarding the armed robbery and responded to the Shell station. They spoke with the witnesses and viewed the surveillance video of the robbery. The surveillance video showed that Freeman came from the area of the car wash when he entered the Shell station, and when he left, he went back toward the car wash area. The officer radioed a description of Freeman, his direction of travel, and a description of the vehicle involved to other officers in the area.

Fort Wayne Police Department Officer Robert Hollo ("Officer Hollo") was patrolling in the area of State Street and Coliseum Boulevard at around 12:50 a.m. in an unmarked vehicle when he received the radio broadcast of the robbery at the Shell station and heard that a red Ford Explorer had been observed circling the Shell station and was most likely the suspect vehicle. At 1:01 a.m., Officer Hollo was at the intersection of Lake Avenue and Coliseum Boulevard and saw a red Ford Explorer matching the description of the vehicle involved in the robbery turning in front of him southbound on Coliseum Boulevard. Officer Hollo radioed dispatch and informed them of the license plate number of the Ford Explorer. Officer Hollo then began to follow the Explorer southbound on Coliseum

2

Boulevard. As he did so, the Explorer began driving erratically, accelerating, weaving in and out of lanes, and passing traffic.

Officer Angie Reed arrived to assist Officer Hollo in a fully marked patrol vehicle and followed Officer Hollo's vehicle. At that time, Officer Hollo activated his vehicle's overhead lights to initiate a traffic stop of the Explorer. The Explorer made an immediate turn onto Reynolds Street at a high rate of speed, ignoring Officer Hollo's attempt to stop it, and accelerated. Officer Hollo followed and activated his siren while pursuing the Explorer. The pursuit continued, reaching speeds of seventy to seventy-five miles per hour and lasted about two minutes, ending at Anthony Boulevard and Hayden Street, where the Explorer turned into a parking lot. As soon as the Explorer reached the parking lot, Freeman, who was the front seat passenger, attempted to exit the Explorer while it was still moving. Freeman was stuck in the seatbelt, and his foot dragged on the pavement, which caused his shoe and sock to come off. Freeman eventually freed himself, exited the Explorer, and fled on foot westbound toward Lillie Street. Officer Hollo radioed to other officers Freeman's description and his direction of flight and stayed with the Explorer until other officers arrived. Officer Hollo ordered the driver, who was later identified as Martin, to exit the Explorer. Martin initially did not comply with the order, but eventually did so. When he did exit the Explorer, Martin was holding an object that he refused to drop, and he refused to comply with any other orders given by Officer Hollo. When Officer Hollo threatened to tase Martin and pulled his Taser from his belt, Martin dropped the object he was holding, which was later discovered to be a cell phone, and fled in the same direction as Freeman had. Martin was apprehended when he fell in the yard of a house. Freeman was subsequently discovered in a bush in front of a house on Lillie Street. Both men were taken into custody.

The police recovered $198 in cash and a striped shirt where Freeman had been hiding in the bush. Inside the Explorer, the police found two black baseball caps, two pairs of gloves, and a dark colored sweatshirt. They also recovered a black cell phone on the front passenger seat and a cell phone lying on the ground outside the driver's door. Zoda and Singh were transported to the scene of the arrest; Zoda was unable to identify either Freeman or Martin, and Singh positively identified Freeman as the man who robbed the Shell station. The cell phones recovered from the scene were forensically examined, and it was discovered that there were twelve telephone calls and ten text messages between the two cell phones in the four days prior to the robbery. A text message between the phones

on July 20, 2013 referred to a "lick," which is common street slang for a robbery.

The State charged Martin with Class B felony robbery and Class D felony resisting law enforcement and alleged that he was a habitual offender. A bifurcated jury trial was held; in the first phase, the jury found Martin guilty of both robbery and resisting law enforcement, and in the second phase, Martin was found to be a habitual offender. The trial court sentenced him to twenty years for Class B felony robbery, enhanced by thirty years for the habitual offender finding, and three years for Class D felony resisting law enforcement, which was ordered to be served concurrently to the other sentence for an aggregate sentence of fifty years executed.

*Martin v. State*, 31 N.E.3d 1043 (Ind. Ct. App. 2015); ECF 12-5 at 1-2.

In the petition, Martin raises numerous claims of trial court error, prosecutorial misconduct, trial counsel error, and appellate counsel error. Martin further asserts error on post-conviction review. Because there is no constitutional right to post-conviction proceedings, this claim does not present valid grounds for habeas relief. *See Flores-Ramirez v. Foster*, 811 F.3d 861, 866 (7th Cir. 2016) ("It is well established that the Constitution does not guarantee any postconviction process, much less specific rights during a postconviction hearing."). He also asserts a freestanding claim of actual innocence. While actual innocence may be a basis to excuse procedural deficiencies, federal courts have not recognized actual innocence as an independent basis for habeas relief. *Herrera v. Collins*, 506 U.S. 390, 404–05 (1993); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017). Consequently, the court declines to further consider the assertion of actual innocence as a freestanding claim.

<u>PROCEDURAL DEFAULT</u>

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

On direct appeal, Martin did not present any of his habeas claims to the Indiana appellate courts. ECF 12-3; ECF 12-7. On post-conviction review, Martin presented his claims of trial counsel error and appellate counsel error to the Indiana Court of Appeals, but the Indiana Court of Appeals found that Martin did not assert any full and complete arguments and declined to "search the record and make up its own

arguments." ECF 12-11; ECF 12-14 at 11-13. In his petition to transfer to the Indiana Supreme Court, he primarily argued that the Allen Superior Court should have conducted an evidentiary hearing, while vaguely asserting that the Indiana Court of Appeals committed "fundamental error" by denying him post-conviction relief. ECF 12-15. Additionally, in an effort to properly exhaust his claims, Martin sought and received a stay of proceeding to pursue a successive petition for post-conviction relief, but the Indiana Court of Appeals denied him authorization to pursue a successive petition. ECF 38, ECF 39, ECF 42, ECF 47. Because Martin did not properly assert his habeas claims at each level of the State court, his claims are procedurally defaulted.

Martin does not straightforwardly assert a cause-and-prejudice argument, but he asserts claims of prosecutorial misconduct, denial of subpoenas, and ineffective assistance of counsel that could serve as a basis for such an argument. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

To the extent that Martin suggests that the prosecution's failure to disclose material evidence prevented him from properly exhausting his claims, he provides no specific explanation as to which claims were affected or how. To the extent that Martin suggests that the denial of subpoenas prevented him from properly exhausting his

claims, he does not explain how this denial prevented him from adequately explaining to the Indiana Court of Appeals how the outcome of trial or direct appeal would have been different or from providing any explanation of his claims to the Indiana Supreme Court.

Martin may also be asserting that ineffective assistance of trial counsel or appellate counsel caused the procedural default of the claims that he should have raised on direct appeal. "Meritorious claims of ineffective assistance can excuse a procedural default." *Richardson v. Lemke*, 745 F.3d 258, 272 (7th Cir. 2014). "But those claims must themselves be preserved; in order to use the independent constitutional claims of ineffective assistance of trial and appellate counsel as cause to excuse a procedural default, a petitioner is required to raise the claims through one full round of state court review, or face procedural default of those claims as well." *Id.* Because Martin did not properly present any ineffective assistance of counsel claims to the appellate courts, they are procedurally defaulted. And, because these ineffective assistance of counsel claims are procedurally defaulted, they cannot serve to excuse the procedurally defaulted nature of any other habeas claims.

The court also considers whether ineffective assistance of post-conviction counsel could excuse the procedurally defaulted nature of the ineffective assistance of trial counsel claims. As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Id.* The exception is that "[i]nadequate assistance of counsel at initial-review collateral proceedings may

establish cause for a prisoner's procedural default of a claim of ineffective assistance at

trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017).

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-
> trial-counsel claim in a collateral proceeding, a prisoner may establish
> cause for a default of an ineffective-assistance claim in two circumstances.
> The first is where the state courts did not appoint counsel in the initial-
> review collateral proceeding for a claim of ineffective assistance at trial.
> The second is where appointed counsel in the initial-review collateral
> proceeding, where the claim should have been raised, was ineffective
> under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). To
> overcome the default, a prisoner must also demonstrate that the
> underlying ineffective-assistance-of-trial-counsel claim is a substantial
> one, which is to say that the prisoner must demonstrate that the claim has
> some merit.

*Id.* at 14. However, the *Martinez* exception "does not concern attorney errors in other

kinds of proceedings, including *appeals from initial-review collateral proceedings*, second or

successive collateral proceedings, and petitions for discretionary review in a State's

appellate courts." *Id.* at 16 (emphasis added). Here, Martin presented his ineffective

assistance of trial counsel claims to the Allen Superior Court in a "initial-review-

collateral proceeding" and received a ruling on the merits. ECF 12-11 at 33-54. Because

Martin did not procedurally default his claims at this level, ineffective assistance of

post-conviction counsel cannot serve to excuse the procedurally defaulted nature of his

habeas claims.

<u>ACTUAL INNOCENCE</u>

Martin also asserts actual innocence to excuse procedural default. A habeas

petitioner can overcome a procedural default by establishing that the court's refusal to

consider a defaulted claim would result in a fundamental miscarriage of justice. *House*

*v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 547 U.S. at 536–37. In this context, the court may consider evidence only if it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015). "The reviewing court then considers the total record—all the evidence, old and new, incriminatory and exculpatory—and makes a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* "It is not the role of the court to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* Actual innocence in the context of federal habeas law "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

The court begins by recounting the evidence presented at trial. Dalvir Singh, through an interpreter, testified that he worked at a gas station with surveillance cameras. Trial Tr. 197-203. At 12:45 a.m., just after midnight on July 23, 2013, a man came into the gas station, pulled out a gun, and ordered Singh to give him money. *Id.* Singh gave the man about three hundred dollars in cash from the cash register. The man left, and he called the store owner, Ranvir Sekhon. *Id.* A customer called the police, and

the police came and interviewed him. *Id.* Later, the police took him to another location where he identified the man who had robbed the gas station. *Id.*

Ranvir Sekhon testified that he came to the gas station as soon as Singh called him, and he allowed the police to review the surveillance recordings. *Id.* at 209-23. The prosecution admitted these recordings into evidence, which the court has reviewed. State's Ex. 2. The recordings showed that the robber was a black man who wore blue gloves, a dark sweatshirt, a dark beanie cap, a white face cover, baggy knee length jean shorts, black tennis shoes, and white socks. *Id.* The robbery occurred quickly with the robber inside the gas station for only about thirty seconds, and a sports utility vehicle drove on the side of the gas station about four minutes before the robbery. *Id.*

Justin Douglas testified that he walked up to the gas station door and saw the robbery in progress. Trial Tr. 232-35. A man pointed the gun at him and told him to leave, so he went back to his vehicle, left the gas station, and called the police. *Id.* He and the other occupants returned to the gas station later to speak with the police.[1] *Id.* Devon Stewart testified that, as he ate pizza in a Papa John's parking lot near the gas station with his friends, his friend Tyler[2] went to buy a drink at the nearby gas station. He then saw a sports utility vehicle drive by three times. *Id.* at 241-48. He identified the vehicle from a photograph, State's Ex. 3. *Id.* The third time struck Stewart as unusual due to the high speed and the activation of a car wash door opener. *Id.* Stewart and his

---

[1] Trial counsel called Douglas at the defense stage to show that he had reported that the robber had left "in a dark car." Trial Tr. 433-37. On cross-examination, Douglas clarified that he did not see the escape vehicle but had relied on the representations of the other occupants in his vehicle. *Id.* at 439.

[2] As of the date of trial, Tyler had moved to Florida. Trial Tr. 252.

friend Cory walked to the gas station. *Id.* The door was locked, but Tyler came out and explained what had happened. *Id.i* Cory Clemmer testified that he was with Stewart at the Papa John's parking lot, and his testimony was consisted with Stewart's testimony. *Id.* at 251-54.

Officer Fairchild testified that dispatch sent him to the gas station based on an armed robbery call. *Id.* at 259-62. He interviewed witnesses and reviewed the surveillance footage, and he shared the information with other members of law enforcement. *Id.* Officer Hollo testified that the armed robbery was reported at 12:50 a.m. and that he started driving in an unmarked vehicle toward the gas station when he learned that a red Ford Explorer had been identified as circling the gas station prior to the robbery. *Id.* at 266-99. At 1:01 a.m., he spotted a similar vehicle in front of him. The Ford Explorer weaved in and out of traffic, and Officer Hollo waited until Officer Reed reached his location before attempting a traffic stop. *Id.* When he activated his lights, the vehicle rapidly turned and accelerated. *Id.* Officer Hollo activated his sirens and pursued the vehicle at 70 to 75 miles per hour. *Id.*

According to Officer Hollo, the vehicle stopped in a parking lot. *Id.* A black male, later identified as Frederick Freeman, exited the passenger side of the vehicle. *Id.* The driver stayed inside the vehicle, and, at trial, Officer Hollo identified the driver as Martin. *Id.* The police instructed Martin to exit the vehicle and walk toward them. *Id.* Martin exited the vehicle but did not comply with other instructions. *Id.* When Officer Hollo displayed his taser, Martin ran away, dropped a cellphone near the vehicle, but was taken into custody after he fell in a front yard. *Id.* Officer Hollo sought assistance

with Freeman, who was found in rose bushes by a canine officer, and he collected cash from him. *Id.* He also collected the cellphone near the vehicle. *Id.*

Detective Grooms testified that he caught up to Officer Hollo when the Ford Explorer had stopped at the parking lot and the passenger had run away. *Id.* at 302-09. He exited his vehicle to search for the passenger. *Id.* He then heard that the driver had also run away, and he arrested the driver, who he identified at trial as Martin, in a front yard. *Id.* Officer Hensler testified that he arrived at the parking lot after Martin had been arrested but before Freeman had been found. *Id.* at 310-66. He inventoried and photographed evidence from the Ford Explorer, including the passenger's black shoe and white sock, cellphone in the passenger seat, blue gloves, red gloves, a blue long-sleeved shirt, a black hat, and a blue hat. *Id.* He also collected a red striped polo shirt and cash near where Freeman had been arrested. *Id.* He calculated the amount of cash as $198. *Id.* He also photographed Freeman after his arrest. *Id.*

The court has reviewed these photographs. ECF 15-1. They indicate that Freeman was wearing baggy knee length blue jean shorts at the time of his arrest. The black shoe, white sock, and blue gloves in the photographs also appear to correspond with the robber's clothing.

Officer Faherty testified that he arrived at the lot with a canine to locate Freeman. *Id.* at 368-78. Shortly thereafter, the canine pulled him toward a row of bushes near a house, and he saw an individual lying down in the bushes. *Id.* At that time, Officer Faherty focused on removing the overly excited dog from the scene. *Id.* Sergeant Taylor testified that, once Martin and Freeman were arrested, he arranged a show-up

12

identification of Freeman for Douglas, Tyler Zoda, and Singh. *Id.* at 382-87. Douglas and Zoda could not identify Freeman as the robber, but Singh said he was "a hundred percent positive that that was him." *Id.*

Detective Morales testified as a mobile forensics expert. *Id.* at 398-424. He examined the two cellphones found in and near the Ford Explorer. *Id.* He determined that the two cellphones had been used to call and text each other in the four days leading up to the robbery. *Id.* In one text message exchange, a cellphone user identified themselves as "Aant." *Id.* A total of 22 text messages had been exchanged between the cellphones. *Id.* In response to a juror question, Detective Morales testified that, on July 20, 2013, a text message read, "Don't mention no names, it's Peeps who told me the lick but hell he got to go." *Id.* at 426-31. According to Detective Morales, "lick" is a slang term that refers to a robbery. *Id.*

As new evidence, Martin has identified police communications records, various lawsuits and complaints, judicial records, an excerpt from the Freeman trial transcript, cell phone records, and affidavits from alibi witnesses. He broadly argues that the police communication records are inconsistent with the evidence presented at trial, and he specifically notes that the records state that "$0" were "stolen." Based on the court's review, these records are materially consistent with the evidence presented at trial, and while, on one occasion, they state that "$0" were "stolen," they also indicate, on the very same page, that "$198" were recovered. ECF 21-1 at 90-98. It seems unlikely that this minor discrepancy would have materially affected the outcome of trial.

Martin also asserts that his cellphone records show that he made telephone calls during the robbery and was at a different location during the robbery. However, he has merely produced a letter from the prosecutor's office from before the trial indicating that ten pages described as "T-Mobile subpoena and response" are attached, but he has not provided this attachment to the court. ECF 21-1 at 89. Even if he had, the fact that he made telephone calls and was a different location at the time of the robbery is consistent with the evidence at trial. The prosecution accused Martin as acting as the getaway driver rather than the principal robber and never represented that Martin was at the gas station at the time of the robbery. Rather, the evidence establishes that Martin was near the gas station at the time of the robbery. Based on the trial record, he was found with the robber driving a red Ford Explorer as Officer Hollo was driving toward the gas station just ten minutes after the robbery. Further, the surveillance recording indicates that a vehicle resembling the red Ford Explorer drove by the side of the gas station four minutes before the robbery, and Stewart and Clemmer testified consistent with this recording that a red sports utility vehicle resembling the Ford Explorer drove by the gas station three times.[3] Moreover, given that the robbery was completed in just thirty seconds, Martin might not have been even in close proximity of the gas station for long.

Next, Martin points to an excerpt to Freeman's trial transcript in which Singh was unable to identify Freeman at his trial, which took place three months after the robbery. ECF 21-1 at 72-79. It is unclear how this evidence suggests that Martin is

---

[3] Indeed, Martin appears to concede that he was near the gas station by now representing, as detailed below, that he was at a party at a nearby apartment complex at the time of the robbery.

actually innocent. According to the undisputed trial evidence, Singh identified Freeman with absolute certainty in the immediate aftermath of the robbery. Even if he had not, substantial evidence in the record indicated that Freeman was the robber. The red Ford Explorer was seen circling the gas station immediately before the robbery, and he was found in that vehicle shortly thereafter. The photographs of Freeman and the clothing found in the car partially match the surveillance recording of the robbery, and he was found with an amount of cash that roughly corresponds to the estimate provided by Singh. He also fled from the police, which suggests consciousness of guilt. As a result, it seems unlikely that Singh's inability to identify Freeman at trial would have affected the jury verdict, particularly when, as the Allen Superior Court noted, the jury in Freeman's trial convicted him of the robbery despite personally witnessing Singh's inability to identify Freeman in court. ECF 12-11 at 44-45.

As new evidence, Martin also offers affidavits or notarized letters from six individuals to support the proposition that he was at a party at a nearby apartment complex at the time of the robbery. ECF 29-1 at 28-48. The court need only recount two of these submissions to illustrate their inadequacy as proof of actual innocence.

### Notarized Letter from Laura Egly, dated September 24, 2013

On July 22nd 2013 I got a message from my girl Maria that I went to high school with and she was saying there was a party and I should come and bring some people. The party was at Maria's girl Amy house on Reed Rd. Me and my girl got there about 10:30-11:00. We were all pissed cause it wasn't no people there. I called Anthony and a couple other male friends to [come]. Anthony said they were just leaving my apt. off Maysville and I wasn't there. Anthony got there at around 11:30 and I met him outside. We was out there smoking when a maroon looking truck. A short dark skinned guy called out "Tracey." Tony said now that's my brother and

they started talking and exchanged numbers. Anthony had called him while we was out there, I'm assuming to program the number. We were at the party for like an hr. and me and my girl and Anthony decided to go to Wildwood and get a bottle and go to my house. I don't know if those guys left, but I didn't recall seeing them at the party. We all left around 1 in the morning. I don't know the guy that Tony was talking to but when we went outside, the truck was gone. The dark skinned guy walked up to Tony and ask him for a ride. Tony said no but dude offered him $20 and I guess Tony told him yes and they got in the truck and left. We was going down Coliseum and I seen Tony pull into the Speedway gas station on Lake and Coliseum. Tony called me and told me dude had to get his stuff out of his girlfriend's car. I asked him did he want us to wait and he said no, he'd call me when everything was cool and we'd meet up. That was the last time I heard from him. Tony called me the next morning and said he was in jail and that dude had pulled a gun on him and told him to not stop the truck or he was going to hurt him and they arrested Tony. I know Tony did not involve himself with no crazy stuff the papers said because he was with us at the party.

**Undated declaration from Frederick L. Freeman**

I am writing in concerns of the matter above, which on July 23, 2013, Anthony Martin and I (Frederick L. Freeman) never drove to Shell Gas Station on 6321 E. State, or in connection, and did not rob nor take any property from any one at that location. I don't know any Dalvir Singh or Tyler Zoda. I got into an argument with my girlfriend and needed a ride home. I seen Tony (Anthony Martin) in them apartments off Reed Road and I asked him for a ride. So I don't know Anthony like that but I do know his brother Tracey well. At no time did we commit any robbery on that day, nor did we drive to the Shell Gas station on 6321 E. State like the charges is claiming us to have done.

ECF 29-1 at 42-47.

As an initial matter, the same compelling evidence that supports the

identification of Freeman as the robber detailed above also supports the identification of

Martin as the getaway driver given that Martin was found in the same vehicle as

Freeman within minutes of the robbery and given that Martin also attempted to flee the

police.[4] The statements of Egly and Freeman suggest Martin and Freeman had exchanged telephone numbers for the first time at a party on July 22, 2013, while the evidence at trial indicated that the cellphones found around the Ford Explorer had first communicated with each other on July 19, 2013. Egly's representation that Martin did not leave the party until after 1:00 a.m. is contradicted by the trial testimony that Officer Hollo spotted Martin's vehicle in traffic at 1:01 a.m.[56] Further, Egly's suggestion that Freeman forced Martin to evade the police in a vehicle chase at gunpoint conflicts with the evidence at trial in which Martin continued to flee the police even after Freeman had fled.

It is also unclear what motive Freeman would have had to flee the police other than committing the gas station robbery, but Freeman expressly denies robbing the gas station and curiously omits holding Martin at gunpoint. Indeed, given that Freeman continues to maintain his innocence, it seems unlikely that Freeman would have cooperated with any effort to portray himself as the sole wrongdoer.

Additionally, Freeman likely would have faced substantial credibility issues given his conviction for the same robbery that Martin was charged with committing at trial and given the self-serving nature of his testimony. *See* Ind. R. Evid. 609(a) (allowing the admission of a robbery conviction to attack the credibility of witnesses). He also

---

[4] Each of the six accounts suffered from this material inconsistency with the trial evidence.

[5] The police records submitted by Martin also indicate that Officer Hollo first reported seeing Martin's vehicle at this time. ECF 21-1 at 92, 98.

[6] Jemiesha Perry and Hasson Martin similarly placed Martin at the party at "about 1:15 maybe 1:30" or "after 1 AM." ECF 29-1 at 31-36.

likely would have been required to answer why he had texted Martin about a "lick" in the days preceding the robbery, why he fled the police, and other potentially incriminating questions. Indeed, placing Freeman on the stand may have actually increased the likelihood of Martin's conviction. In sum, the anticipated testimony of these alibi witnesses would have substantially conflicted with the compelling evidence adduced at trial and also with each other, and Freeman's testimony in particular would have faced significant credibility concerns. Consequently, the court cannot find that no reasonable juror would have found petitioner guilty beyond a reasonable doubt if these alibi witnesses had testified consistently with their written statements at trial.

Martin also offers his complaints and civil lawsuits filed against the police department, the prosecutor's office, the public defender's office, and the trial court as new evidence to show that they had a motive to conspire against him to obtain his conviction. ECF 21-1 at 60-65, 81-83, 109-14. He also asserts that police investigator Mark Rogers was involved in the investigation of his case and faced criminal charges for rape and falsifying documents. ECF 21-1 at 84. This new evidence does not directly or significantly undermine any of the material evidence presented at trial. It does not demonstrate that any evidence was fabricated; at most, it weakly suggests that these might have had a motive to fabricate evidence. Nor does Martin, with the exception of Singh's identification, suggest that any particular article of evidence at trial was fabricated. As a result, the court finds that a reasonable juror could have found Martin guilty beyond a reasonable doubt despite these investigations, complaints, and civil

lawsuits. Consequently, the court cannot find that Martin has demonstrated actual innocence.

EVIDENTIARY HEARING

Martin filed a motion for an evidentiary hearing. To obtain an evidentiary hearing, Martin must clear two significant legal hurdles. First, he must demonstrate that "such a hearing could enable [him] to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

Second, Martin must show that he qualifies for an evidentiary hearing under 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Here, the court pauses to observe that the habeas petition suffers from the same defect that plagued Martin's appellate briefs on post-conviction review. Specifically, the petition does not state "the facts supporting each ground." *See* Rule 2(c)(2) of the Rules Governing Section 2254 Cases. In his traverse, Martin states some facts to support his claim for actual innocence and his claims that trial counsel failed to object to the trial court's "jurisdiction," failed to suppress Singh's identification of Freeman, and failed to locate potential alibi witnesses.[7] However, due to the lack of factual support or meaningful development, the court declines to further consider the remainder of his claims. *See United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("[P]arties [must] make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud."); *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.'); *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

In his claim that trial counsel failed to object to the trial court's jurisdiction, Martin argues that the initiation and dismissal of Case No. 02D04-1307-MC-1851 and

---

[7] Martin also elaborates on his claim that he was wrongfully denied subpoenas at the post-conviction stage, but, as stated above, procedural errors at the post-conviction are not a valid basis for habeas relief.

the subsequent initiation of his State criminal case violated his right against double jeopardy. Based on the docket sheet in Case No. 02D04-1307-MC-1851, it appears that, on July 24, 2013, the Allen Superior Court held an initial hearing, found probable cause to detain Martin, and set bond. ECF 21-1 at 66-67. On July 29, 2013, the Allen Superior Court dismissed the miscellaneous case on the prosecution's motion. *Id.* Martin also argues that the dismissal of this miscellaneous case indicates that the State did not have probable cause to detain him until trial.

Significantly, jeopardy did not attach in Case No. 02D04-1307-MC-1851, so the initiation of his State criminal case did not violate the Double Jeopardy Clause. *See Martinez v. Illinois*, 572 U.S. 833, 839 (2014) ("There are few if any rules of criminal procedure clearer than the rule that jeopardy attaches when the jury is empaneled and sworn."). Further, while detainees are entitled to a prompt judicial determination of probable cause, there is no constitutional requirement that the probable cause determination take place under the same case number as his conviction. *See Mitchell v. Doherty*, 37 F.4th 1277, 1279–80 (7th Cir. 2022) ("[T]he Fourth Amendment mandates a prompt judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest."). Moreover, even if trial counsel had challenged the basis for his detention or for the criminal charges, it is unclear why Martin believes that he would have prevailed. According to the record, law enforcement had gathered most of the trial evidence within hours of the robbery, and this evidence would have been

sufficient to demonstrate probable cause.[8] *See United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) ("[A] finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime."). In short, an evidentiary hearing would not assist Martin in prevailing on this claim.

With respect to his claims that trial counsel failed to suppress Singh's identification of Freeman and failed to locate potential alibi witnesses, the court first notes that these claims substantially overlap with his assertion of actual innocence. As detailed above, the prosecution's case did not need Singh's testimony to identify Freeman, and the alibi witnesses would have had substantial credibility issues. On this basis, the court also finds that the Allen Superior Court did not unreasonably determine that Martin had failed to demonstrate prejudice in connection with these claims.

Moreover, review of Martin's briefs reveals little to suggest that an evidentiary hearing would assist Martin in prevailing on these ineffective assistance claims or his actual innocence claim. One possible exception is his allegation that trial counsel failed to investigate whether the apartment complex where Martin had allegedly attended a party had surveillance cameras that could have confirmed his presence at the apartment complex when the robbery occurred. The record indicates that Martin attempted to subpoena trial counsel, prosecuting attorneys, law enforcement, and alibi witnesses. ECF 12-11 at 12; ECF 12-13 at 7. However, there is no indication that Martin ever tried to

---

[8] Though not the focus of this habeas petition, Martin also faced a charge of resisting law enforcement, which also could have served as a basis to detain him pending a criminal trial.

obtain apartment surveillance footage at the post-conviction stage, so he "failed to develop" the factual basis of this claim in State court and cannot obtain an evidentiary hearing under 28 U.S.C. § 2254(e)(2). Additionally, Martin offers no indication that he could now produce such surveillance footage for consideration in this habeas case.

Accordingly, the motion for an evidentiary hearing is denied. Because his claims are procedurally defaulted, the court cannot grant him habeas relief.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Martin to proceed further.

For these reasons, the court DENIES the motion for an evidentiary hearing (ECF 50); DENIES the amended habeas corpus petition (ECF 4); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on September 17, 2024.

s/ Scott J. Frankel
Scott J. Frankel
United States Magistrate Judge